J-S51024-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DURON BOSTON PEOPLES | |
| Appellant | No. 3317 EDA 2014 |

Appeal from the Judgment of Sentence October 24, 2014
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0004220-2009

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 30, 2015**

Duron Peoples appeals from the judgment of sentence imposed by the Court of Common Pleas of Chester County after a jury convicted him of first-degree murder[1] and related offenses.  After careful review, we affirm.

At trial, the Commonwealth established that on October 21, 2006, Eric Coxry shot Jonas Suber to death with a .45 caliber semi-automatic weapon at his home in Coatesville.  The Commonwealth further established that Peoples solicited Shamone Woods to arrange for Coxry to commit the murder after another individual, Donte Carter, failed to carry out the shooting.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

On October 2, 2014, the day after Peoples' conviction, the jury convened and sentenced Peoples to life imprisonment for first-degree murder. On October 24, 2014, the court formally imposed the sentence of life imprisonment, along with several concurrent sentences for other offenses. However, with respect to Peoples' conviction for soliciting Donte Carter to kill Suber,[2] the court imposed a consecutive sentence of ten to twenty years' imprisonment.

This timely appeal followed in which Peoples raises the following issues for our review:

1. Whether the trial court erred in denying [Peoples'] motion to exclude from evidence the .38 firearm that was seized from [Peoples'] residence at 282 Carlyn Court, Cain Township, Chester County, Pennsylvania.

2. Whether the trial court erred in permitting the witness, Clarence Milton, to testify to letters allegedly written by co-conspirators, to third parties, years after the conspiracy concluded, as such statements were not attributed to [Peoples], and were otherwise inadmissible hearsay.

Appellant's Brief, at 7.

With respect to Peoples' first issue, our standard of review regarding the admissibility of evidence is an abuse of discretion.

"[T]he admissibility of evidence is a matter addressed to the sound discretion of the trial court and . . . an appellate court may only reverse upon a showing that the trial court abused its discretion." *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958, 967 (2001) (citations omitted). "An abuse of discretion is

---

[2] 18 Pa.C.S. § 902.

not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." ***Commonwealth v. Hoover***, 16 A.3d 1148, 1150 (Pa. Super. 2011).

***Commonwealth v. Collins***, 70 A.3d 1245, 1251-52 (Pa. Super. 2013).

On September 12, 2014, Peoples filed a motion *in limine* to preclude the admission of a .38 revolver that police found at his residence during a search on November 10, 2006. The motion stated that Peoples was not charged with illegally possessing the revolver and that "neither Peoples nor any co-conspirator [was] alleged to have utilized the aforementioned .38 revolver to commit the homicide that is the subject of the instant prosecution." Motion *in limine*, 9/12/14, at 2.

In response, the Commonwealth noted:

This is the relevance of the .38 caliber revolver: Mr. Victor Devalia has related that, when Mr. Peoples extracted a .45 caliber semi-automatic pistol from the laundry room of 282 Carlyn Court the evening before Mr. Suber was murdered, he also produced a .38 caliber revolver with a taped handle. On November 10, 2006, when executing a search warrant of the residence, detectives located a .38 caliber revolver in the laundry room matching the description given by Mr. Devalia. Since it is most assuredly the case that the defense will at trial make a concerted attempt to discredit Devalia, the importance of the .38 as it was found by the police is that it corroborates one aspect of Devalia's story.

Commonwealth's Memorandum of Law, 9/12/14, at 3.

By order dated September 22, 2014, the trial court denied Peoples' request to exclude evidence of the .38 caliber weapon. On appeal, Peoples argues that the court abused its discretion because admitting the weapon "was so inflammatory that it created [a] substantial and unjustifiable risk of

inciting the jury to decide this case on the unrelated, physically dissimilar, firearm evidence alone." Appellant's Brief, at 12.

At trial, the following exchange occurred between the attorney for the Commonwealth and Devalia:

Q:   [A]fter Mr. Peoples came out of the Home Depot, where did the two of you fellas go?

A:   Back to his home on Carlyn Court.

Q:   Back there?

A:   Yes.

Q:   And whose idea was that?

A:   Mr. Peoples.

Q:   And when you got back to 282 Carlyn Court, what happened there?

A:   He started reaching – he started reaching up in the ceiling.

Q:   Okay.  Let me stop you right there.  Did he extract any firearms?

A:   Yes, sir.

Q:   How many?

A:   Two.

Q:   And from which room did Mr. Peoples, the defendant, extract two firearms at 282 Carlyn Court?

A:   There is a little, like a little laundry room type – laundry room right off the kitchen.  He got it from up in there.

Q:   And with regard to the two weapons, can you describe them for the jury?

A:   One was a revolver and one was a big black automatic, said it was a .45.

- 4 -

Q:    Okay.  And with regard to the revolver, was there anything about the handle that you remember?

A:    It was kind of old.

Q:    Okay.  I'm going to show you what's been marked as Commonwealth 68.  Just take a look at it.  Just take a look at that and tell us what is in the box marked 68, if you can.

A:    Revolver.

Q:    And just for the record purposes, to the best of your recollection, is this the revolver that you observed Mr. Peoples extract from the laundry room at 282 Carlyn Court?

A:    Yes, sir.

N.T. Trial, 9/24/14, at 125-27.

The Commonwealth also called Detective Kevin Campbell of the Coatesville Police Department as a witness.  He testified that while executing a search warrant at Peoples' home on November 10, 2006, he found a revolver in the laundry room ceiling.  He identified Commonwealth Exhibit 68 as the weapon.  Detective Campbell also identified a photograph of the .38 that was taken during the execution of the search warrant.  N.T. Trial, 9/26/14, at 122-23.

The final reference to the .38 occurred during closing argument, where the Commonwealth stated:

The police search Carlyn Court and they find that, a .38 which just happens to match exactly what Mr. Devalia told the police he saw.  He got that right.  He's corroborated in that respect.

N.T. Trial, 9/30/14, at 103.

Evidence of crimes, wrongs or other acts is not admissible to prove a person's character. However, "this evidence may be used for another purpose." Pa.R.E. 404(b)(2). Here, the trial court held that evidence of the .38 caliber revolver "forms part of the history and natural development of the events in this case, and thus has a well-established permitted 'purpose' use under Rule 404(b)(2)." Trial Court Order, 9/22/14, at 2. We disagree.

In the instant matter, the Commonwealth established no connection between the .38 caliber revolver and the events leading up to Suber's murder or to the murder itself. We contrast this to **Commonwealth v. Owens**, 929 A.2d 1187 (Pa. Super. 2007), where the defendant used a shotgun to threaten three men who attempted to pick up a child for court-ordered visitation. Police were called and the men left with the child. Shortly thereafter, Owens rammed his Ford Explorer into the car occupied by the men and child, then showered the car with bullets. Four days later, police arrested Owens and a search of his car yielded .22 caliber bullets. "A search of Owens' home produced two rifle scopes and a scope mount, shotgun shells, rifle ammunition, handgun ammunition and a .22 caliber handgun barrel." *Id.* at 1189.

On appeal, Owens challenged the denial of his motion to preclude admission of the shotgun shells. This Court held that "the shotgun shells seized from Owens' home were relevant, since such evidence forms part of the history and natural development of the events and offenses for which . . . Owens [was] charged." *Id.* at 1191. Here, because the .38 caliber

revolver was not relevant to the crimes charged, the trial court abused its discretion by admitting the weapon as forming part of the history and natural development of the case.

Nevertheless, we find that admission of the .38 caliber revolver was harmless error.

> Harmless error is established where either the error did not prejudice the defendant; or the erroneously admitted evidence was merely cumulative of other untainted evidence; or where the properly admitted and uncontradicted evidence of guilt was so overwhelming the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Owens**, **supra**, at 1192 (citation omitted).

Here, the jury heard testimony that Peoples drove to Chester County from Georgia in October 2006 with the intention of arranging for the killing of Suber. On October 20, 2006, Devalia drove Peoples to a Home Depot in Downingtown where he met with Shamone Woods and handed him an envelope. Devalia then drove Peoples to his house where Peoples removed a .45 caliber semi-automatic pistol from a hiding place. Peoples explained to Devalia that "this was what the big boys used to get the job done." N.T. Trial, 9/24/14, at 128.

In the early evening of October 20, 2006, Devalia drove Peoples to the parking lot of a Regal Theater in Downington, where Devalia put on an Afro wig before entering the theater. The Commonwealth presented evidence that while Peoples was in the theater he gave the .45 caliber weapon to

Woods, who in turn provided it to Coxry to kill Suber. When Peoples came out of the building, he and Devalia began their return trip to Georgia.

In light of this evidence, admission of the .38 caliber revolver was harmless error that does not require reversal.

Peoples next argues that the trial court abused its discretion by allowing Commonwealth witness Clarence Milton to testify regarding portions of two letters written by one of Peoples' co-conspirators, Jeremiah Bush, to prison inmate Jamil Dabney.

At trial, Milton testified that at 8:00 p.m. on October 20, 2006, he was at a crack house at 3rd and Chestnut in Coatesville with several people including Bush, when Woods and Coxry came in with their friend Eppie. Coxry removed a .45 caliber semi-automatic weapon from his person and handed it to Milton. When Milton handed the gun back to Coxry, Coxry explained that they were in Coatesville "taking care of the whole situation that they had to take care of that was involving Mr. Suber." N.T. Trial, 9/23/14, at 102. They mentioned $20,000 for the job. *Id.*

Woods, Coxry and Eppie left the house shortly thereafter but Bush stayed behind. When Milton went to sleep, Bush was still in the house. However, shortly after Milton awoke the following morning, between 9:00 and 10:00 a.m., he saw Bush coming in the door.

At trial, the Commonwealth asked Milton to identify a letter that Bush sent to his friend Jamil Dabney, an inmate at SCI-Fayette. The letter, which was received on December 15, 2008, is signed "Young." Milton testified that

Bush is known as "Young."  Milton also identified a letter to Dabney that was received on March 9, 2015, and was signed "Gangsta."  The return address on the envelope indicated that the sender was "Lil Bro."  Milton testified that Bush is also known by these names.

The letter received on March 9, 2015 is written in unconventional jargon and refers to several individuals by nicknames.  After reviewing the letter, Milton testified that the author, Bush, is asking Dabney to find out whether Coxry is talking to the authorities about Bush's involvement in the 2006 murder.  *Id.* at 119.[3]

Peoples argues that the letters were inadmissible hearsay, and that even if there was a conspiracy to kill Suber, the letters were written years after the conspiracy ended.  Peoples also notes that he did not write the letters and that he is not referenced in them.

Pa.R.E. 801 defines hearsay as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a

_____

[3] The letter states, in part:

> Remember buddy who was over [S]omerset with you, and he asked you not to tell me that he was up there?  Young said see what[']s his set!  Give him this game and see how he react.  Be careful though because he might be singing!

Commonwealth Exhibit, 51A.

party offers into evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c).

The Comment to Rule 801 provides, in relevant part:

A statement is hearsay only if it is offered to prove the truth of the matter asserted in the statement. There are many situations in which evidence of a statement is offered for a purpose other than to prove the truth of the matter asserted.

Sometimes a statement has direct legal significance, whether or not it is true. For example, one or more statements may constitute an offer, an acceptance, promise, a guarantee, a notice, a representation, a misrepresentation, defamation, perjury, compliance with a contractual or statutory obligation, etc.

More often, a statement, whether or not it is true, constitutes circumstantial evidence from which the trier of fact may infer, alone or in combination with other evidence, the existence or non-existence of a fact in issue. For example, a declarant's statement may imply his or her state of mind, or it may imply that a particular state of mind ensued in the recipient. Evidence of a statement, particularly if it is proven untrue by other evidence may imply the existence of a conspiracy or fraud. Evidence of a statement made by a witness, if inconsistent with the witness's testimony, may imply that the witness is an unreliable historian. Conversely, evidence of a statement made by a witness that is consistent with the witness's testimony may imply the opposite. **See** Pa.R.E. 613(c).

Pa.R.E. 801, Comment.

Here, Peoples was charged with, and convicted of, conspiracy to commit first-degree murder. The Commonwealth argues that portions of the letters were not offered to prove the truth of the matter asserted, but as circumstantial evidence of the formation and existence of a conspiracy. **See Commonwealth v. Cassidy**, 462 A.3d 270 (Pa. Super. 1983).

- 10 -

The trial court determined that the letters constituted non-hearsay evidence of a co-conspirator's verbal act of reaching out to third party to make sure that an additional co-conspirator did not cooperate with the police.  *See* Trial Court Order, 9/8/14, at 2.  Having reached this conclusion, the trial court proceeded to determine that the letters, which were evidence of prior bad acts, were admissible because "the probative value of the evidence outweighs its potential for unfair prejudice."  Pa.R.E. 404(b)(2).

Peoples has failed to establish that the trial court abused its discretion by denying his motion *in limine* to preclude admission of the letters. Accordingly, he is not entitled to relief on this issue.

Judgment of sentence affirmed.

GANTMAN , President Judge, concurs in the result.

PLATT, J. concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/30/2015